UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD MINNESOTA, NORTH DAKOA, SOUTH DAKOTA, and CAROL E. BALL, M.D., | ) ) ) ) | Civ. 05-4077-KES |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| MIKE ROUNDS, Governor, and LARRY LONG, Attorney General, in their official capacities, | ) ) ) ) | |
| Defendants, | ) ) | |
| ALPHA CENTER, BLACK HILLS CRISIS PREGNANCY CENTER, d/b/a Care Net, DR. GLENN A. RIDDER, M.D., and ELEANOR D. LARSEN, M.A., L.S.W.A., | ) ) ) ) ) ) | |
| Intervenors. | ) | |

INTRODUCTION

In view of the recent en banc determination of the Eighth Circuit Court of Appeals in Planned Parenthood v. Rounds, 05-3093 (8th Cir. June 27, 2008), Plaintiffs carry a very heavy burden. In order to prevail on their motion for preliminary injunction, they must demonstrate, with regard to any particular claim, that they are "likely to prevail on the merits." Slip. Op. at 12 (quoting Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975). This "more rigorous standard," Slip Op. at 13, "reflects the idea that governmental policies implemented throughout legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Slip Op. at 13 (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995) (per curium). The en banc Court of Appeals squarely placed the "burden of proof" for demonstrating the unconstitutionality of any particular

matter on the proponents of the injunction. Slip Op. at 13. The Court of Appeals recognized the applicability of Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curium), which emphasized that a "preliminary injunction 'should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion' and presents proof even more substantial than required on a motion for summary judgment." Slip Op. at 19-20.

A.   Plaintiffs' attack on the Constitutional relationship disclosures in section (7)(c) and (d) is without merit.

The requirement that an abortion patient be told that she has an "existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota," is alleged by Plaintiffs to be unconstitutional. Plaintiffs assert in paragraph 18 of their Complaint that these disclosures require women to receive and understand information that is "not truthful, non-misleading factual information concerning the abortion procedure, attendant health risks or risks of childbirth."

The en banc Court of Appeals recognized the "State's (and the public's) interest in providing pregnant women with *all possible relevant information* about abortion, thereby 'reducing the risk that women may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed.'" Slip Op. at 22, n.11 (quoting Planned Parenthood v. Casey, 505 U.S. 833, 882 (1992)) (emphasis added). See also Gonzales v. Carhart, 127 S.Ct. 1610, 1634 (2007) ("the State has an interest in ensuring so grave a choice [as abortion] is well informed"). In this context, therefore, Planned Parenthood must assume the burden of showing that the information required by the statute is "untruthful, misleading, or not relevant to the patient's decision to have an abortion." Slip Op. at 17.

Casey, at 505 U.S. at 859, unequivocally demonstrated that Roe v. Wade, 410 U.S. 113 (1973) had been "sensibly relied upon to counter" suggestions that the "State might as readily

restrict a woman's right to choose to carry a pregnancy to term as to terminate it." <u>Casey</u> further cited cases holding that government officials "violate the Constitution by 'coercing a minor to have an abortion.'" <u>Id.</u> (citations omitted).

<u>Casey</u>, in this respect, follows earlier precedent which recognizes the relationship between parents and children as a fundamental liberty interest protected by the Constitution. <u>See</u> cases cited in Doc. 19, p. 9 (Defendants' Opposition to Motion for Preliminary Injunction). The Supreme Court has also made it clear that the mother's relationship with her child during the gestational period enjoys protection. <u>Lehr</u>, 463 U.S. at 259-60, n. 16 (1983) (quoting <u>Caban v. Mohammad</u>, 441 U.S. 380, 398-99 (1979) ("the mother carries and bears the child, and in this sense her parental relationship is clear").

Likewise, the laws of South Dakota protect that relationship. Indeed, the very law under attack here is one of the laws which protects that relationship. In addition, other pre-existing statutes protect a woman's right with regard to her unborn child. <u>See</u> SDCL 21-5-1 (wrongful death action with regard to an unborn child); SDCL ch. 22-16 (defining various degrees of homicide to include the death of an "unborn child"); SDCL 59-7-2.8 (protecting the mother's relationship with the "unborn child" in the context of artificial hydration); SDCL 25-7-19 (protecting the relationship of the mother with the unborn child in the context of divorce and support obligations).

Further, any argument by the Plaintiffs that these disclosures cannot be mandated because they are legal, rather than medical in nature, has already been rejected by the Eighth Circuit Court of Appeals. "Information deemed relevant in <u>Casey</u> was not limited to information about the medical risks of the procedure itself; the State also required the physician to inform the patient that the father of her child would be liable for child support and that other agencies and

3

organizations offered alternatives to abortion." Slip Op. at 15-16. The en banc court continued, stating that "[s]uch information was relevant because it 'furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed.'" Slip Op. at 16 (quoting Casey, 505 U.S. at 882). The disclosure regarding a father's liability for child support is no doubt legal, rather than medical in nature. But even though a doctor might be asked questions about child support liability that he or she cannot answer, such disclosures have not been deemed unconstitutional. The doctor's responsibility is to disclose the required information. Any further questions by the patient can and should be referred, if necessary, to someone else with the requisite expertise to answer them. Clearly a doctor who cannot answer such questions about the father's liability could not be held criminally liable given the scienter requirement in SDCL 34-23A-10.2 (see also Gonzales v. Carhart, 127 S.Ct. at 1628, 1631-32).

The information set forth in the relationship disclosures is certainly "relevant." In the context of waiving one's parental rights in an adoption, a comprehensive statutory scheme exists to ensure that the parent is fully aware of the consequences of his or her decision. See SDCL ch. 25-5A. The legislature sought to ensure the same level of awareness in the abortion context. See Doc. 19, Ex. 1, pp. 5-6 (Testimony of Rep. Hunt). Several women testified before the State Legislature that they often felt pressure from others "to have an abortion" or felt "coerced by others to have an abortion." See, e.g., Doc. 19, Ex. 1, p. 9, (testimony of Carol Kling); Doc. 19, Ex. 1 at 21 (testimony of Karen Holy); Doc. 34, (Declaration of Lisa P. Strafford at ¶ 16). The South Dakota Legislature found at SDCL 34-23A-1.4, that "a woman seeking to terminate the life of her unborn child may be subject to pressures which can cause an emotional crisis, undue reliance on the advice of others, clouded judgment and a willingness to violate conscience to

avoid these pressures." The disclosures in Section 7(c) and (d) counter such pressures by informing the prospective abortion patient of her right to carry her baby to term.

B.      <u>Plaintiffs have not demonstrated that the suicide risk disclosure is untrue, misleading, irrelevant or vague</u>.

As the en banc Court of Appeals found, the "State has a significant role to play in regulating the medical profession." <u>Planned Parenthood v. Rounds</u>, 05-3093, June 27, 2008, Slip. Op. at 16 (quoting <u>Gonzales v. Carhart</u>, 127 S.Ct. 1610, 1633 (2007). The Court of Appeals held that the State can appropriately use its "regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might encourage the patient to choose childbirth over abortion." <u>Id.</u> at 17. The Court of Appeals further held that no constitutional violation is established unless the opponent of the statute "can show that the disclosure is either untruthful, misleading or not relevant to the patient's decision to have an abortion." <u>Id.</u>

The scope of the burden is clear. The Plaintiff must demonstrate that it is "likely to prevail on the merits" of this claim. <u>Id.</u> at 12 (quoting <u>Doran v. Salem Inn, Inc.</u>, 422 U.S. at 931). In addition, as the Court of Appeals indicated, the preliminary injunction should not be granted on these grounds unless the "movant, *by a clear showing*, carries the burden of persuasion' and presents proof even more substantial than required on a motion for summary judgment.'" Slip Op. at 13 (citing <u>Mazurek</u>, 520 U.S. at 972).

Further, Plaintiffs have an even greater burden here because they have chosen to bring this action as facial challenge. In <u>Washington State Grange v. Washington State Republican Party</u>, 128 S.Ct. 1184 (2008), the Court squarely found that facial challenges are "disfavored." <u>Id.</u> at 1191. In considering assertions about possible misinterpretations of the challenged statute, <u>Grange</u> emphasizes that the potential for confusion was "sheer speculation." 128 S.Ct. at 1193.

5

The Court said that in cases involving a "facial challenge . . . we cannot strike [the statute] on its face based upon the mere possibility of voter confusion." Id. Nor can Planned Parenthood succeed in enjoining the disclosures required in this case simply because of their speculation about potential misinterpretations of the statute. That is not the function of a facial challenge.[*]

Finally, it is now established that medical uncertainty alone is not enough for a successful facial challenge in the abortion context. In Gonzales v. Carhart, the Court found that its "precedents instruct that the Act can survive this facial attack. This Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." Gonzales, 127 S.Ct. at 1636. In fact, said the Court, where there is uncertainty, "legislative options must be especially broad." Id. (quoting Marshall v. United States, 414 U.S. 417, 427 (1974)). As Gonzales concluded, the law "need not give abortion doctors unfettered choice in their course of medical practice. . . ." Id.

The question thus becomes whether Planned Parenthood has succeeded in surmounting these very substantial burdens. The answer is clearly no.

> 1. Based upon the evidence regarding suicide and suicide ideation submitted to the Court in June of 2005, Plaintiffs' attack fails.

The State submitted substantial evidence that there was an increased risk of suicide and suicide ideation at the time of the June 2005 hearing. First, the State submitted expert evidence that "women undergoing induced abortion had at least twice the rate of suicide." Doc. 28, Declaration of Dr. Elizabeth Shadigian at ¶ 13. Dr. Shadigian's Declaration was supported by a careful academic study of the effects of abortion. John Thorp, M.D., Katherine E. Hartman, M.D., PhD., Elizabeth Shadigian, M.D., *Long Term Physical and Psychological Health*

---

[*] Plaintiffs' vagueness argument regarding this disclosure is clearly without merit, particularly when also considering the scienter requirement in SDCL 34-23A-10.2. See Gonzales, 127 S.Ct. at 1628, 1631-32.

6

*Consequences of Induced Abortion: Review of the Evidence*, 58 CME Review Article 67 (2002). This article identifies the "association between induced abortion and either suicide or suicide attempt." Id. at 74. It explains that other studies "that demonstrated increased risk of depression or emotional problems after induced abortion in certain subgroups may explain the psychopathology that culminates in deliberate self harm." Id. at 73-74, Table 7. Dr. Shadigian explained to the legislative committee that there are "several studies looking at an increased rate of suicide and suicide ideation, which only has been seen to occur when women have an induced abortion, but not occur when women have miscarriages or go to term with a pregnancy." Doc. 19. Ex. 2, at 5. Dr. Shadigian, along with her co-authors of the above-cited study, opined that "any woman contemplating an induced abortion should be cautioned about the mental health correlates of an increased risk of suicide or self-harm attempts." Id. at 76. While Plaintiffs assert that such increased risk is not present for all patients, "no physician can reliably predict who will experience a certain short or long term complication." Shadigian Declaration, Doc. 28 at ¶ 13.

Second, strong evidence of suicide and suicide ideation was produced from abortion counselors. Nichole Osmundson, an R.N. and volunteer at a crisis pregnancy center, testified before the legislature that, "In my experience, I would say over 50 percent [of post-abortion clients] have admitted that they've had suicidal thoughts or have attempted suicide since their abortion. In my experience over 75 percent have admitted they've had self-destructive or punishment type behaviors against themselves." Doc. 19, Ex. 2 at 21. Similarly, Leslee Unruh, in her Declaration, stated that post-abortion clients "often report seriously lower self esteem and suicide ideation. Some of our clients report that they attempted suicide because of their depression over their abortions." Doc. 30 at ¶ 12.

Third, at least four individuals testified about their own suicide ideation. Carol Kling stated that after her abortion, "I became very depressed and I had thoughts of suicide, and I began to drink a lot." Doc. 19, Ex. 1 at 10. Amy Julian testified that after her abortion, "At times my self-esteem was so low that I had thoughts of suicide behavior." Doc. 19, Ex. 1 at 16. Becky Soske told the legislature that after the abortion, "I became instantly depressed and suicidal." Doc. 19, Ex. 2 at 32. Teresa Oxen, in her Declaration, states that after her abortion, "I had serious ideas about suicide and I attempted suicide on four or five occasions. I attempted to overdose on pills and have cut my wrists." Doc. 35 at ¶ 4.

In summary, the State produced evidence from an expert supported by a compelling academic study, from abortion counselors, and from abortion victims, all supporting the fact that suicide and suicide ideation are genuine risks of abortion.

Planned Parenthood, on the other hand, produced only the unsupported statement that the risk of suicide and suicide ideation is simply not true as "applied to every patient or most patients." Doc. 13, Declaration of Carol Ball, M.D. at ¶ 8. Whether *most* patients experience suicide ideation is not the point, as previously noted by the Court. Transcript of June 28, 2005, motion hearing at p. 33.

Because Plaintiffs clearly did not demonstrate that this legislative enactment was untruthful, misleading, irrelevant, or vague, their claim cannot succeed.

2. <u>If the additional Summary Judgment evidence is considered by the Court, the result is the same</u>.

The State agrees with Intervenors' letter of July 9, 2008, which states that in considering the preliminary injunction request, the Plaintiffs are "confined to the record that existed before the Court in June, 2005." However, in an abundance of caution, and without waiving the

argument that the record should be so confined, the State submits this additional argument based on the current summary judgment record. The result is the same in either case.

The State and Intervenors produced a substantial body of evidence demonstrating a very strong association between abortion and suicide and suicide ideation. First, it is clear enough that Planned Parenthood does not adequately screen its patients for such things as depression, prior suicide attempts or treatment of mental health issues. The patient educators rely upon the doctors. See State's Summary Judgment, Ex. 5 at 68; State's Summary Judgment, Ex. 9 at 82-83. The doctors, however, rely upon the educators. See State's Summary Judgment, Ex. 4 at 50-51. In any event, it is simply not possible for Plaintiffs' doctors to know in advance the likelihood of depression or psychological risks to a particular patient. State's Summary Judgment, Ex. 4 at 54-56.

In the pioneering study by Mika Gissler, et al., *Suicides After Pregnancy in Finland, 1987-94: Register Linkage Study*, British Medical Journal, December 7, 1996, at State's Summary Judgment Ex. 60, the authors reported that "the suicide rate associated with birth was significantly lower (5.9) and the rate associated with miscarriage (18.1) and induced abortion (34.7) were significantly higher than in the population." Id. at 1431. Another pioneering work is that of David M. Fergusson et al., *Abortion in Young Women and Subsequent Mental Health*, Journal of Child Psychology and Psychiatry (2006). State's Summary Judgment, Ex. 61. The authors studied women who had become pregnant and a portion of whom had an abortion. They reported that "those having an abortion had elevated rates of subsequent mental health problems including depression, anxiety, suicidal behaviors and substance use disorders. This association persisted after adjustment for compounding factors." Id. at 16. See also State's Summary Judgment, Ex. 73 (Ex. B), Reardon, et al. *Deaths Associated with Abortion Compared to*

*Childbirth, A Review of New and Old Data and the Medical and Legal Implications,* Journal of Contemporary Health and Policy 2004; 20(2): 279-327 at 11: ("after controlling for age and psychiatric history, aborting women were 3.1 times more likely to die from suicide compared to delivering women." );  State's Summary Judgment, Ex. 62 (Ex. D), Shadigian and Bauer, *Pregnancy-Associated Death: A Qualitative Systematic Review of Homicide and Suicide,* 60 CME Review Article 183 2005, at 189:  (identifying two "case-control studies that show a much higher rate of both homicide and suicide in women who obtain an abortion compared with women who carry their pregnancy to term").

Dr. Priscilla Coleman's Declaration summarized the five "available studies dealing with abortion and suicidal behavior" which had met the "established epidemiological criteria for isolating a significant risk factor and meriting dissemination of the information to women." State's Summary Judgment, Ex. 73 at 5.  When Dr. Coleman considered the data as a whole, she concluded, "it is evident that abortion has been demonstrated to be a consistently strong risk factor for suicidal behavior and an abortion clearly places a woman at an increased risk of suicide ideation and suicide.  The studies are all large scale, prospective in nature, and they incorporate a variety of different types of comparison groups as well as additional control techniques, effectively fortifying the level of confidence in the results derived." Id. at 5-6.  Exhibit A attached to the Coleman Declaration summarizes the five studies, each of which concluded that abortion was significantly associated with suicide ideation, deliberate self harm, or suicide itself.  See also State's Summary Judgment, Ex. 59, Speckhard Dep. at 111-115.

Furthermore, the State has produced substantial evidence from individuals regarding adverse psychological consequences they experienced as a result of abortion, which include suicide ideation and attempts.  Lisa Hartman stated that after her abortion: "I became suicidal

10

and had suicidal thoughts for almost ten years." State's Summary Judgment, Ex. 25 at ¶ 6. Teresa L. Oxen stated that after her abortion, "I had serious ideas about suicide and I attempted suicide on four or five occasions. I attempted to overdose on pills and have cut my wrists." State's Summary Judgment, Ex. 27 at ¶ 4. Elizabeth Avila testified that "thoughts of suicide would come to me or thoughts of cutting myself, abortion was always the thing that would come to mind." State's Summary Judgment, Ex. 11 at 40-41. Carrie Sanchez explained her "suicidal thoughts" by stating, "well, I just didn't want to live." State's Summary Judgment, Ex. 27 at 114, Line 1. She had not had suicidal thoughts before. Id. at Lines 5-7. Deborah Gute attributed her "suicidal ideation" to abortion and said that she had been to "counseling for it." State's Summary Judgment, Ex. 27 at 33, Lines 19-20. Rebecca Soske testified that she did not try "physically to commit suicide, but I thought about it. I thought about how I could do it." State's Summary Judgment, Ex. 14, p. 107, Lines 21-22. Stacy Wollman, the Executive Director of the Black Hills Crisis Pregnancy Center, testified that the Black Hills Center counsels women who had abortions. State's Summary Judgment, Ex. 30 at ¶ 19. She testified further in her Affidavit that "many of these women show signs of depression and report suicidal ideation." Id.

     Much of the evidence above, especially that from individuals who related their own experiences and the experiences of those that they had treated, is uncontroverted direct evidence that abortion may cause suicide ideation. Yet, the sum total of the information Plaintiffs' patients receive regarding psychological side effects of abortion is set forth in the following statement: "Emotional reaction - most women report a sense of relief after abortion. Some women also experience sadness, guilt, or other emotional reactions, *although these feelings usually go away quickly*. Serious psychiatric disturbances (such as psychosis or serious depression) occur rarely and less frequently after abortion than they do after childbirth." State's Summary Judgment Ex. 4

(Ball Dep. Exhibit 5) (emphasis added).  This disclosure illustrates Plaintiffs' unexplainable refusal to acknowledge the gut-wrenching agony experienced by many post-abortive women.  This failure to adequately inform women of the potential adverse psychological effects of abortion mandated the disclosures at issue.

      Regarding the statistical studies which correlate suicide and suicide ideation with abortion, Planned Parenthood claims that such associations are not real "risks" and that the medical community does not recognize such associations as having valid public health weight.  To the contrary, the State pointed out in State's Summary Judgment, Ex. 63, 25 C.F.R. 201.57(e), the federal regulation requiring that the labeling of drugs "shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved."  The language in question "remains unchanged" and is now found at 21 C.F.R. § 201.80(a) (2007).  See Colacicco v. Apotex, Inc. 521 F.3d 253, 259 n. 3 (3d Cir. 2008).  In Colacicco, the court emphasized the importance of the language requiring only an association and not a "causal relationship" to require the change in drug labeling.  521 F.3d at 259.  It is notable that Colacicco considered this issue in the context of drug labeling and suicide risk.  521 F.3d at 259 n.2.  See also O'Neal v. Smith Kline Beecham Corp., ____ F.Supp.2d _____, 2008 WL 275782 at *12 (E.D. Cal. 2008).  (In considering whether a warning regarding Paxil and increased suicidality is warranted under federal regulations, both parties "agree that [the drug company] was only obligated to warn of the claimed risk if there was reasonable evidence of an *association* of a serious hazard with the drug.'") (emphasis added).  In summary, federal government regulations require, and courts have accepted,  labeling on the basis of  associations, rather than requiring causation to be proven, contrary to Plaintiffs' assertions in this case.

12

Even Plaintiffs' own exhibits validate the challenged disclosure, stating that "[e]levated mortality risk after a terminated pregnancy has to be recognized in the provision of health care and social services." Plaintiffs Summary Judgment, Ex. U at 462. See also Gissler at State's Summary Judgment, Ex. 60: "Our data clearly show, however, that women who have experienced an abortion have an increased risk of suicide, which should be taken into account in the prevention of such deaths." Id. at 1434. Plaintiffs clearly have not met their burden to establish that they are likely to prevail on the merits of their claims regarding the challenged suicide disclosure.

C.   The provisions of Section 7 are severable.

Planned Parenthood has essentially admitted that certain portions of Section 7 as enacted by the Legislature in 2005 are completely valid. Thus, it would be unjust to require an injunction against the provisions which, for example, (1) required a physician to provide a referral to a pregnancy health center, and (2) require a doctor to inform the patient of the risks of "depression and related psychological distress," particularly since Planned Parenthood has now amended its Complaint to delete both of those claims. See Document 199. Moreover, the ruling of the en banc Court precludes a preliminary injunction of the central disclosure at issue - that the unborn child is a "whole, separate, unique, living human being" and that the term "human being" is defined as a "member of the species homo sapiens . . . during the entire embryonic and fetal ages." Now, despite the Eighth Circuit's en banc ruling against them on that issue, Planned Parenthood may now request that the Court do indirectly, what it cannot do directly. Such a result would surely be contrary to the intentions expressed by the en banc Court of Appeals.

There are, essentially, two Sections which have, to date, been argued to be applicable to the severability situation, which are as follows:

13

> Section 10.  If any court of law enjoins, suspends, or delays the implementation of *the provisions* of section 7 of this Act, the provisions of [the previous version of the statute] are effective during such injunction, suspension, or delayed implementation.  (Emphasis added.)
>
> Section 11.  If any court of law finds *any provisions* of section 7 of this Act to be unconstitutional, the other provisions of section 7 are severable.  If any court of law finds *the provisions* of section 7 of this Act to be entirely or substantially unconstitutional, the provisions of [the previous version of the statute] are immediately re-effective.  (Emphasis added.)

Regardless of whether or not Section 11 applies at this stage of the proceedings, Planned Parenthood does not dispute that Section 10 does apply. However, Section 10 applies only if a court enjoins "the *provisions* of section 7 of this Act."  Section 10, by its very terms, does not apply in the case of an injunction against one *provision* of the Act or less than all provisions of the Act.  Planned Parenthood v. Rounds, 467 F.3d 716, 730 (8th Cir. 2005) Guender, J., dissenting) (vacated on Jan. 9, 2007).  Section 11 specifically differentiates between scenarios in which "any provisions" versus "the provisions" of the Act are found unconstitutional.  While the Legislature did not expressly state in Section 10, what occurs if a single provision or less than all provisions of Section 7 of the Act were enjoined, the distinction between "any provisions" and "the provisions" in Section 11 should provide guidance to the Court on what should occur if a single provision is enjoined.  In such case, that provision is "severable."

In addition,  the decision of the United States Supreme Court in Ayotte v. Planned Parenthood, 546 U.S. 320 (2006) should resolve this issue.. In Ayotte, the Supreme Court, in the context of abortion litigation, stressed that the Court attempts "not to nullify more of a legislature's work than is necessary, for we know that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'"  546 U.S. at 329 (quoting Regan v. Time, Inc., 468 U.S. 641, 652 (1984) (plurality opinion)).  The Court concluded that the "normal rules"

14

favored "partial" rather than complete invalidation. 520 U.S. at 329 (quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504 (1985)).

Two circuit courts of appeal have applied Ayotte in the context of preliminary injunctions. In Planned Parenthood Cincinatti Region v. Taft, 444 F.3d 502, 517 (6th Cir. 2006) the Sixth Circuit applied Ayotte in the context of a preliminary injunction and held that the "proper course is to vacate in part the district court's order, leaving the preliminary injunction undisturbed insofar as it prohibits unconstitutional applications of the statute." Similarly, the Tenth Circuit, in Kansas Judicial Review v. Stout, 519 F.3d 1107, 1122 (10th Cir. 2008) applied Ayotte in the context of a preliminary injunction. See also IMS Health Corp. v. Rowe, 532 F. Supp.2d 183, 186 n.1 (D. Maine 2008). Indeed, there does not appear to be *any* authority for refusing to apply Ayotte to a preliminary injunction situation, except the now vacated panel decision in this case.

State law likewise strongly favors severability. In this case, if the Court finds that the precise severability sections cited above do not supply an explicit answer to the question at issue, another statute, which is applicable, should resolve the question. SDCL 34-23A-20 states:

> If a part of this chapter is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this chapter is invalid in one or more its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

This statute unequivocally requires that any severable part of a statute in Chapter 34-23A, necessarily including the subparts of Section 7, "remain in effect."

Not only does statutory law strongly favor severability, but South Dakota case law, as interpreted by both the State and Federal courts, also clearly favors severability. In South Dakota Education Association v. Barnett, 582 N.W.2d 386 (1998) the Court established that the "'burden to show that the legislature would not have enacted the statute without the severed

15

portion is on the shoulders of the person arguing against severability.'" 582 N.W.2d at 394 (quoting Sutherland). The Court there found that the proponent of severability had "failed to carry this burden." Id.

The South Dakota Supreme Court then clarified the matter even further by contrasting the rule in Massachusetts with the rule in South Dakota. The Massachusetts rule, according to the Court, allowed a reviewing court to strike all of a bill if it is "unable to know whether Legislature would have enacted a particular bill without the unconstitutional provision." 582 N.W.2d at 394 (citation omitted). The Massachusetts statute was directly contrasted with South Dakota law as set out in Matthews v. Linn, 99 N.W.2d 885, 888 (S.D. 1959), to the effect that "where the reviewing court [in South Dakota] cannot say the Legislature would not have enacted the remainder of the chapter without the offending paragraph, the holding of unconstitutionality is limited to the assailed paragraph." Id. Therefore, the heavy burden is on Planned Parenthood to demonstrate that the South Dakota Legislature would not have enacted each and every provision of the statute. See also Currey v. Currey, 650 N.W.2d 273, 277-78 (S.D. 2002).

The federal courts have accepted, without question, the strong South Dakota rule favoring severability. The Court of Appeals in Dakota, Minnesota, and Eastern Railroad Corporation v. South Dakota, 362 F.3d 512, 518 (8th Cir. 2004), found that the proponent of non-severance bore the "burden of showing the legislature would not have enacted the statute without the invalid portions." 362 F.3d at 518-19. It concluded that the proponent had not, agreeing with the District Court that "'the statute has significant meaning and purpose even without the offending portions.'" 362 F.3d at 519. See also American Meat Institute v. Barnett, 64 F. Supp.2d 906, 922-23 (D.S.D. 1999) (District Court carefully analyzed each section of the statute to determine whether it must be enjoined, finding severability appropriate to several sections).

Convincing evidence that the South Dakota Legislature intended the remaining parts of the statute to go into effect even in the event any other parts were enjoined, is found in the legislative findings. For example, SDCL 34-23-1.6 found that "great care should be taken to provide a woman seeking to terminate the life of her unborn child and her own constitutionally protected interest in a relationship with her child with complete and accurate information and adequate time to understand and consider that information . . . ." SDCL 34-23-1.4 specifically mentions the "stress and pressures from circumstances or from other persons" that pregnant women face in determining whether to seek an abortion. SDCL 34-23-1.6 refers to the standard of practice requiring health care practitioners and physicians to provide patients with "such facts about the nature of any proposed course of treatment, the risks of a proposed course of treatment, the alternatives to the proposed course, including any risks . . . as a reasonable patient would consider significant. . . ." SDCL 34-23-10.1 also makes unequivocal the legislative intent to insure that no abortion can be performed unless the doctor first obtains a voluntary and informed written consent.

Finally, the legislative history indicates a deep legislative dissatisfaction with the ability or willingness of abortion clinics to provide needed assistance to pregnant women. See, e.g., Doc. 19, Ex. 1 at 6 (comments of Representative Hunt, sponsor of the bill) (bill deals inter alia, with problem that "most abortions" are uninformed); Doc. 19, Ex. 1 at 4 (comments of Sen. Bartling on need for "full knowledge"); Doc. 19, Ex. 1 at 9-11 (comments of Carol King on lack of knowledge); Doc. 19 at 29-31 (comments of Carol Kling and Amy Julian regarding their post-abortion psychological distress). Therefore, it is clear that the legislature intended the sections of this Act to be severable.

## CONCLUSION

17

Based upon the foregoing arguments, evidence and authority, Defendants respectfully request that Plaintiffs' request for a preliminary injunction be denied. In the event that the Court preliminarily enjoins any single provision of the challenged Act, Defendants request that the Court find the remaining provisions severable and in effect.

                Respectfully submitted,

                LAWRENCE E. LONG
                ATTORNEY GENERAL

                /s/John P. Guhin
                John P. Guhin
                Assistant Attorney General
                1302 East Highway 14, Suite 1
                Pierre, SD  55701-8501
                Telephone (605) 773-3215
                john.guhin@state.sd.us