IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD MINNESOTA, NORTH DAKOTA, SOUTH DAKOTA, and CAROL E. BALL, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> MIKE ROUNDS, Governor, and LARRY LONG, Attorney General, in their official capacities, <br><br> Defendants. <br><br> ALPHA CENTER, BLACK HILLS CRISIS PREGNANCY CENTER, d/b/a Care Net, DR. GLENN A. RIDDER, M.D., AND ELEANOR D. LARSEN, M.A., L.S.W.A. <br><br> Intervenors. | Civil Case No.: 05-4077-KES <br><br><br> MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

## INTRODUCTION

As this Court is aware, this action challenges the constitutionality of South Dakota Codified Laws § 34-23A-10.1 ("Act"), a statute that establishes an array of mandatory disclosure obligations upon physicians providing abortion services. On June 30, 2005, this Court found that Plaintiffs had a "fair chance" of prevailing on their claim that the requirement that the physician advise his patient that the abortion would "terminate the life of a whole, separate, unique, living human being," SDCL § 34-23A-10.1(1)(b) ( "Homo Sapiens" provision) was unconstitutional. This Court then preliminarily enjoined the entire Act based on the provisions of Section 10 of the Act, which requires that any suspension or preliminary injunction extend to the entire Act while the litigation proceeds.

On June 27, 2008, a divided Eighth Circuit, *en banc*, reversed this Court's holding on the Homo Sapiens provision and remanded this case for further proceedings. In so doing, the Circuit announced a new standard to be met when a party seeks a preliminary injunction, as here, against a statute. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, No. 05-3093, 2008 WL 2550722, at *5-7 (8th Cir. 2008) (en banc) ("*Rounds III*"). The Eighth Circuit also stated that "[o]n remand, the district court may, in its discretion, address the other arguments in support of the preliminary injunction in the first instance." *Id.* at *7 n.7.

In two letters to counsel, both dated July 9, 2008, this Court stated that it would now rule on the remaining grounds upon which Plaintiffs' original preliminary injunction motion was based pursuant to the new standard set forth by the Eighth Circuit. This Court also allowed each party to submit an additional Memorandum of Law to address three issues:

1. Plaintiffs' claim that SDCL §§ 34-23A-10.1(1)(c) and (d)—which require the physician to tell his or her patient that she "has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota" and that, "by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated"—are likely unconstitutional because they require the physician to make statements that are not truthful, are misleading, and are not a reasonable regulation of the medical practice, and because, in concert with the requirement that the patient certify that she understands these statements, SDCL § 34-23A-10.1(1), constitute an undue burden.

2. Plaintiffs' claim that SDCL §§34-23A-10.1(1)(e)(ii)—which requires that the physician state to his patient that an **"increased risk of suicide and suicide ideation"** are "known

medical risks" of abortion—is likely unconstitutional because these statements are not truthful and are misleading.

3. Plaintiffs' claim that, if any section of the Act is preliminarily enjoined, the entire Act must be preliminarily enjoined under Section 10, and the prior informed consent law remains in force during the period of the preliminary injunction.

This Memorandum of Law is submitted, pursuant to the Court's letters, to address these issues.[1]

While the preliminary injunction appeal was proceeding, the parties completed discovery and filed cross-motions for summary judgment on many of the challenges to different components of the Act. This Court granted Defendants' motion to withhold ruling on the summary judgment motions until the *en banc* decision was handed down. However, as a result of the discovery, the record accumulated. In particular, the record on the "increased risk of suicide" disclosure has been augmented substantially since the filing of the original preliminary injunction motions. Accordingly, and particularly because of the change of the applicable standard since the filing of the original motions, Plaintiffs will refer to that augmented record in addressing the issues covered in this Memorandum. Finally, Defendants and Intervenors cannot

---

[1] The other claims raised, and still be ruled upon, by Plaintiffs' preliminary injunction motion, but which are not addressed in this Memorandum are:

    1. SDCL § 34-23A-10.1(e)—which requires disclosure of "(e) . . . *all known medical risks* of the procedure and *statistically significant risk factors* to which the pregnant woman would be subjected, including: . . . (iv) *All other known medical risks* to the physical health of the woman . . ."—is unconstitutionally vague.

    2. SDCL § 34-23A-10.1—which provides that the Act's requirements need not be met only in a medical emergency where the physician determines that obtaining informed consent from the woman or next of kin is "impossible"—is unconstitutional.

3

possibly be prejudiced by reference to the record because they have already addressed the record in their summary judgment briefs, to which the Court may refer.

## ARGUMENT

I.  **THE CONSTITUTIONAL RELATIONSHIP DISCLOSURES ARE UNCONSTITUTIONAL.**

   A.  **The Constitutional Relationship Disclosures Are Untruthful And Misleading And Not A Reasonable Regulation of Medicine.**

Requiring a physician to tell a pregnant woman that she has an "existing relationship" with the embryo or fetus developing in her body, and that the relationship is protected by the United States Constitution, is so fraught with problems as to render the disclosure untruthful, misleading, and not a reasonable regulation of medicine.[2] First, the phrase "existing relationship" on its own and as used in the Act is open to multiple physical, psychological, economic, socio-religious, ideological, and legal interpretations, inherently conducive to confusion. The Act does not attempt to define what is meant by the "existing relationship," and therefore there is no definitional remedy to its confusing and misleading character as the Eighth Circuit was able to employ to save the Homo Sapiens disclosure in *Rounds III*. Second, it is nothing but a novel legal theory to assert that the federal constitution protects this relationship, whatever it is. Third, whatever the State means by "constitutional relationship," abortion is the *exercise* of a constitutional right, not the *termination* of a constitutional right, as the Act states. Fourth, it is unreasonable to conscript a physician, not only to deliver this message, but to be

---

[2] The *en banc* decision does not mention this last requirement ("reasonable regulation of medicine"). Nonetheless, *Casey* is clear that in addition to being truthful and nonmisleading, a mandated disclosure must be a "reasonable" regulation of medicine to survive First and Fourteenth Amendment challenges. *Casey*, 505 U.S. at 884 (in the First Amendment context, state regulation of medicine must be "reasonable"); 883 (noting that particular measure "is a reasonable measure" to ensure an informed choice and therefore not an undue burden)

responsible, under pain of criminal penalty, to explain these murky subjects until both the woman and the physician can certify she understands them.

As a threshold matter, the compelled statement that there is an "existing relationship" between a pregnant woman and the embryo or fetus has broad and varied meanings, not all of which are true for every woman. Although there is obviously a biological connection between the woman and the fetus, nothing in the Act's language or definitions limits the meaning of "relationship" to a "biological" or "physical" relationship. "Relationship" can also mean a psychological or emotional relationship, or the religious bonds that a woman may perceive to arise upon fertilization or thereafter. But, of course, not every pregnant woman will have this type of relationship with the embryo or fetus, or have the relationship arise at the same time. Thus, the mandated statement that a woman has a "relationship" with the fetus is untruthful and misleading because it conveys to all pregnant woman something that may only be true for some, but not others. This variation and ambiguity is of the same character that the *en banc* majority acknowledged as constitutionally problematic in the Homo Sapiens disclosure in *Rounds III,* but was able to overcome by reference to an explicit statutory definition. In contrast, none of the operative terms in the Constitutional Relationship Disclosures are defined, and thus the constitutional defects are uncured, and uncurable by statutory construction.

Setting aside these definitional issues, the concept that an abortion terminates a federally protected constitutional relationship of any kind does not even make sense. *Roe* and *Casey* make clear that the United States Constitution protects the woman's *right* to choose an abortion, a right that is rooted in both the right to decide whether to bear a child and the right to physical autonomy. *Casey,* 505 U.S. at 875 (citing *Roe*), 884. There is no mention in *Casey* of the Constitution recognizing or protecting a "relationship" between the woman and the developing

5

embryo or fetus. Rather, the Court makes clear that the interest is in allowing the woman to reach her own conclusion about whether such a relationship exists, and its nature and meaning to her:

> At the heart of liberty is the right to define one's own concept of existence, or meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

*Casey*, 505 U.S. at 851.

Thus, it is certainly misleading, if not outright untruthful, for the State, by conscripting a physician, to tell a woman that she has a "relationship" that is protected by the United States Constitution. To the contrary, *Casey* stands for the proposition that it is for the woman to decide, and not for the State to determine or compel that she be told, whether she has a relationship with the developing embryo or fetus.

In the extensive litigation to date, Defendants and Intervenors have offered no authority to the contrary. Cases relied on by Defendants and Intervenors involving parents and the care and custody of their (born) children provide no support for the "constitutional relationship" disclosure. *See Lehr v. Robertson*, 463 U.S. 248 (1983) (state not required to provide notice of adoption hearings to biological father who had never established relationship with child); *Santosky v. Kramer*, 455 U.S. 745 (1982) (when state could terminate parental rights after proving permanent neglect, due process required at least "clear and convincing evidence" standard); *Stanley v. Illinois*, 405 U.S. 645 (1982) (state could not deprive unwed father of the custody of his children upon death of the mother without a hearing on his fitness as a parent); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (state cannot force children to attend public schools); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (state cannot criminalize teaching certain languages in school before eighth grade); *Smith v. Org. of Foster Families*, 431 U.S. 816 (1977)

(New York city and state statutory and regulatory procedures for removing foster children from foster homes did not violate the due process rights of foster parents); *Lassiter v. Dept. Soc. Services of Durham County*, 452 U.S. 18 (1981) (indigent parents not entitled to appointed counsel in every parental status termination proceeding); *see also Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (recognizing liberty interest in living with relatives that are not nuclear family members). These cases discuss parents and children, and the constitutional protection of that relationship from state interference. None of these cases address or even contemplates the entirely different situation of a pregnant woman seeking an abortion, where the constitutional protection is of the woman's right to determine whether to continue or to terminate her pregnancy.[3] The cases which do address, explicitly, that situation, *Roe* and *Casey*, are quite clear in phrasing the constitutional interest differently—namely, the woman's right to determine whether to continue or to terminate her pregnancy.

Thus, the disclosures are nothing more than a novel legal theory not only unsupported by, but wholly inconsistent with, the Supreme Court's constitutional jurisprudence. *Cf. Alexander v. Whitman*, 114 F.3d 1392, 1403-04 (3d Cir. 1997) (declining to "determine whether a mother's relationship with her unborn child during pregnancy is a fundamental interest"). Indeed, the concept of constitutionally protected "relationship" would only make sense in the context of a relationship between two constitutionally protected *persons*, and it remains the law that an embryo or fetus is not a person within the meaning of the United States Constitution. *Roe v.*

---

[3] Defendants have argued that the language from *Lehr*, 463 U.S. at 260 n.16—that "the mother carries and bears this child, and in this sense her parental relationship is clear" demonstrates that a pregnant woman's relationship with the embryo or fetus enjoys constitutional protection. Of course, in that case, the Court is also referring to the relationship a mother, or parent, has with her child after the child is born—not a pregnant woman's supposed relationship with the embryo or fetus.

*Wade,* 410 U.S. 113, 158 (1973). The disclosures are therefore "untruthful" and "misleading," and compelling physicians to advance them as fact to a patient is unconstitutional.[4]

Finally, even if the disclosures could somehow be construed in a manner to render them truthful and nonmisleading, they are not a reasonable regulation of medicine. Unlike the Homo Sapiens disclosure, which as construed in *Rounds III* concerns only matters of the flesh, the Act requires that physicians inform the woman of matters of constitutional and state law, and comprehend those legal matters well enough to be able to explain, answer potentially wide-ranging questions about, and certify that the woman understands them. As explained below, it is doubtful whether a woman contemplating an abortion would understand the disclosures without further explanation, and it is unreasonable to expect that physicians will be able to engage in the type of complex legal discussion necessary to assure that a woman understands this assertion. Even Intervenors' attorney has acknowledged that it "would take a Constitutional scholar to answer" certain basic questions about the disclosures. Plaintiffs' LR 56.1(b) Statement of Undisputed Facts in Support of Motion for Summary Judgment ¶13 ("Pls.' Statement"), Ex. Q.

### B. The Constitutional Relationship Disclosures Likely Impose An Undue Burden On A Woman's Constitutional Right To Choose An Abortion.

The constitutional relationship disclosures likely impose an undue burden on women's constitutional right to choose to an abortion. "A finding of an undue burden is shorthand for the conclusion that a state regulation has the *purpose or effect* of placing a substantial obstacle in the

---

[4] Likewise, the notion that "the laws of South Dakota" protect an existing relationship between a pregnant woman and the developing embryo or fetus is creative theorizing, but not an accurate statement of the law. Again, the Act does not define or explain to what "laws of South Dakota" it is referring. Certainly laws concerning adoption procedures, wrongful death actions, criminal homicide, support obligations, and life-sustaining treatment for a pregnant woman are addressed to considerations other than protecting any existing relationship between the pregnant woman and the developing embryo or fetus. None even remotely contemplate, let alone explicitly address the uncertain concept that the Act compels physicians to explain to their patients.

path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (emphasis supplied).

While the majority in *Rounds* does not reach Plaintiffs' undue burden claim (but nonetheless invites this Court to address that claim in support of a preliminary injunction, *see Rounds*, 2008 WL 2550722, at *7 n.7, the dissent correctly concludes that Plaintiffs are likely to succeed on that claim:

> The provisions mandated by [Sections 34-23A-10.1(1)(b)-(d)] far exceed those at issue in *Casey* and the other statutes which have been upheld since then . . . . [T]he mandatory advisories . . . also more than likely impose an undue burden on a woman's decision to have an abortion before viability. That is because their apparent intent and probable effect is to place substantial obstacles in the way of a woman attempting to exercise her constitutional right to obtain an abortion. Under [Section 34-23A-10.1(1)], a woman seeking an abortion must sign "each page of the written disclosure <u>with the certification that she has read and understands all of the disclosures</u> . . ." (emphasis added). By way of comparison, the informed consent provisions upheld by the Supreme Court and lower courts mandate only that a woman certify that required information has been made available to her. *See Casey*, 505 U.S. at 902; *see also Newman*, 305 F.3d at 686; *Karlin*, 188 F.3d at 455; *Miller*, 63 F.3d at 1467; *Schafer*, 18 F.3d at 527; *Eubanks*, 126 F. Supp. 2d at 461-62.

*Rounds*, 2008 WL 2550722, at *20 (Murphy, J., dissenting).

First, the purpose of the constitutional relationship disclosures is to place substantial obstacles in the way of a woman seeking an abortion. The Court can infer improper purpose, where, as here, the disclosures far exceed not only any mandatory disclosure provision upheld by the Supreme Court or any other court, as the dissent makes clear, but, as far as Plaintiffs are aware, any mandatory disclosure provision passed by any legislative body.[5] As one

---

[5] In addition to requiring that physicians inform their patients of the novel legal theory that the U.S. Constitution and the laws of South Dakota protect an "existing relationship" between a pregnant woman and the embryo or fetus, the Act requires that physicians also be able to explain and answer questions about that legal theory until both the physician and the patient can certify that the patient understands it. The "non-medical" disclosures in *Casey*, 505 U.S. at 903, and

9

constitutional scholar noted, "[t]he obvious objective of the Act . . . is to use the concept of 'informed consent' to eliminate abortions." *Rounds* III, 2008 WL 2550722, at *13 (citation omitted). Indeed, the Act was passed by the same legislature that soon after enacted the "South Dakota Women's Health and Human Life Protection Act" in 2006 (H.B. 1215, 81st Leg. (S.D. 2006)), a statute banning virtually all abortions in the South Dakota. Hence, the State is likely motivated by the purpose of imposing an undue burden on women seeking abortion in South Dakota.

Second, the clear effect of the Act is to erect substantial obstacles. Section 34-23A-10.1(1) requires patients to certify they understand the disclosures before they can have an abortion. But the evidence demonstrates that, even if the constitutional relationship disclosures could in some sense be construed as technically accurate, patients will not understand what they mean. For example, Jane Doe #1 testified:

> Q. Ms. Doe, if at the time of your abortion Dr. Van Oppen had given you a statement in writing providing the following information: That the pregnant woman has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota, and that by having an abortion her existing relationship and her existing Constitutional rights with regards to that relationship will be terminated, would you have understood that statement?
>
> A. I would need it to be discussed.
>
> Q. Okay. What would you need to—what would have been a follow-up question on your part?
>
> A. It's not about questions, it's about him explaining everything to me.
>
> Q. Okay. So that statement alone you would not have understood?
>
> A. When I was in my state of mind on September 23? No.

---

other informed consent provisions upheld by the lower courts—in sharp contrast—merely required that the information be made available to the woman.

Q. Okay. So you have needed some clarification as to what your Constitutional rights were exactly?

A. Yes.

Q. So you would not have understood instinctively as to what your Constitutional rights would be?

A. On that day, yes.

Q. Sitting here today, if I read—

A. I know what some of my rights are, but I can't list them off to you.

Q. Well, I mean just specifically with respect to the statement that by having an abortion your existing relationship and your existing Constitutional rights with regard to that relationship, would you understand what I mean by Constitutional rights with regard to that relationship with the unborn human being, would you understand that?

A. It's kind of a broad question. That's asking me—to the full extent of a lawyer, no.

Q. That's not what I am asking you.

A. To the full extent of somebody who knows the law? No.

Q. No, I am just asking you sitting here today as you, not as a lawyer, if I were to tell you that you had an existing relationship with—assuming that you were pregnant—with the unborn human being and that by having an abortion your existing relationship with that unborn human being and your existing Constitutional rights with regards to that relationship will be terminated, would you be able to understand that statement?

    MR. CASSIDY: You mean fully understand?

A. If I was told that on that day without explanation, it would have went it one ear and out the other.

Q. Okay. But sitting here today, would you be able to understand that statement?

A. To the full extent, no, without explanation, no.

Doe Dep. at 307:18-309:23 (Pls.' Statement, Ex. Q). Of course, it is unreasonable to expect, as the Act does, that physicians will be able to comprehend these complex legal matters well

11

enough to be able to explain, answer questions about, and certify that the woman understands them. Even Intervenors' attorney has acknowledged that it "would take a Constitutional scholar to answer" certain basic questions about the disclosures. Pls.' Statement at ¶ 13. The *Rounds III* dissent agrees:

> The Act's reference to a constitutional relationship between the woman and her unborn child is unclear and undefined. If a woman were to ask her doctor what precisely is meant by her "existing constitutional rights with regards to that relationship" . . . and the doctor declined to answer her question on the grounds of being unqualified to discuss such vague legal concepts, the doctor could be subject to prosecution after performing an abortion. In her affidavit Dr. Ball stated that she would not be able to clarify the concepts the Act requires to be communicated because these are not medical statements or facts that I am trained as a Medical Doctor to address." Ball Aff. ¶ 4. How then would a physician be able to certify that the patient understands the required advisories and proceed to perform an abortion?

*Rounds III*, 2008 WL 2550722, at *21 (Murphy, J., dissenting).

Because they will not understand the constitutional relationship disclosures, patients will not be able to complete the necessary certification. The likely effect of the constitutional relationship disclosures is thus to preclude patients from exercising their constitutional right to choose an abortion altogether. *See Rounds III*, 2008 WL 2550722, at *21 (Murphy, J., dissenting).

## II. THE SUICIDE DISCLOSURES ARE UNCONSTITUTIONAL

South Dakota Codified Laws §§34-23A-10.1(1)(e)(ii) requires the physician to tell a pregnant woman that the "known medical risks" of abortion and the "statistically significant risk factors to which [she] . . . would be subjected" if she has the abortion include an "increased risk of suicide ideation and suicide."[6] A "known" risk is one that is generally recognized as such or

---

[6] This risk factor provision makes no sense and supports Plaintiffs' argument that Section (1)(e) is void for vagueness. Dr. Shadigian made clear that a "risk factor" refers to a predisposing condition that a patient has before a procedure whereas a "risk" is something that a patient is

proven.[7] The record before the Court makes clear that suicide and suicide ideation are not generally recognized or proven risks of abortion. The American College of Obstetricians and Gynecologists, the leading professional association of physicians who specialize in the health care of women, rejects any suggestion that such psychological sequelae are known risks of abortion. Shadigian Depo. Ex. 14 (July 10, 2006 Bell Decl. Ex. 3); *see also* Shadigian Depo. at 136, l. 19- 139, l. 7 (June 2, 2006 Branson Decl. Ex. O). Moreover, Defendants' expert witness, Dr. Shadigian,[8] testified that she does not know of a single provider of elective abortion services in the United States that warns women that one of the risks of abortion is an increased risk of suicide. Pls.' Statement at ¶ 21. She also made clear that the University of Michigan, where she practices, does not include suicide or suicide ideation in the list of possible complications in their patient materials on induced abortion. Pls.' Statement at ¶ 22. Likewise, the abortion informed consent forms prepared by the Michigan Department of Community Health and mandated for use in Michigan do not include suicide or suicide ideation in the list of risks and complications. Pls.' Statement at ¶ 23. As explained below, the federal Food and Drug Administration (FDA) also does not recognize suicide or suicide ideation as one of the risks of abortion. The State has failed to date to explain how purported risks that are generally unrecognized should be regarded as known risks.

Defendants' own experts also admit there are no well-controlled studies linking abortion and suicide. *See* Coleman Depo. at 101, l. 21-102, l. 14 (August 8, 2006 Second Branson Decl. Ex. HH)

---

subject to <u>during or after</u> a procedure. Pls.' Statement at ¶ 19. Thus, an "increased risk of suicide" cannot both be a risk of abortion and a risk factor for abortion. Likewise, it is nonsensical to talk of risk factors "to which the pregnant woman would be subjected."

[7] *See* The American Heritage Dictionary of the English Language ("known" as an adjective is defined as "proved or generally recognized: *the only known case; a known authority*"); Encarta World English Dictionary, North American Edition ("known" as an adjective is defined as "1**. acknowledged:** generally recognized as or proven to be something ● *a known criminal)* (italics and bold in originals).

[8] Dr. Shadigian ultimately testified so thoroughly in favor the Plaintiffs that her testimony is a center piece of Plaintiffs' motion for summary judgment.

("The problem with the [Gissler] data set is they lack information on the wantedness of pregnancy. They also lack information on the sociodemographic variables . . ."). *See also* June 2, 2006 Branson Decl. Ex. V at 76; Shadigian Depo. at 120, ll.2-14, and 124, ll. 4-17 (June 2, 2006 Branson Decl. Ex. O); Coleman Depo. at 110, l. 1-111, l.1 (Defs. S.J. Ex. 35). Dr. Shadigian agrees that to assess any link between maternal death and abortion, one of the variables that should be controlled for is the wantedness of pregnancy. Pls.' Statement at ¶ 20. In the absence of such research, Dr. Shadigian concedes that it cannot be concluded that an increased risk of suicide is a risk of abortion: "Because of the lack of a proper control group . . . it will be hard to inform women as to what, <u>if any</u>, additional risk a decision to terminate will produce. *Id.*

> The *Rounds* dissent further confirms that suicide is not a recognized risk of abortion:
>
> The legislative determinations with respect to the state's view that abortion results in significantly increased risks of depression or even suicide are highly questionable in light of medical studies in the United States and abroad which have refuted the theory that women undergoing abortions suffer from long term emotional harm or are more at risk than women who carry their pregnancy to term. A learned commentator has point out that the [SDCL § 34-23A-10.1(1)(e)] provisions "very likely . . . require physicians to disclose <u>information that is false</u>." *See* Post, *supra*, at 961 (emphasis added); *see also Carhart II*, 127 S. Ct. at 1649 n.7 (Ginsburg, J., dissenting) (citing numerous peer reviewed studies suggesting no evidence of postabortion syndrome and related depression exists).

*Rounds*, 2008 WL 2550722, at *22 (Murphy, J., dissenting). Thus, it is untruthful and misleading to tell a woman that "increased risk of suicide ideation and suicide" are "known medical risks" or abortion.

The false and misleading nature of the mandated suicide warnings is confirmed by comparison to the actual medical risks of abortions. Dr. Shadigian agrees that it is false and misleading to state that abortion causes or may cause suicide. Pls.' Statement at ¶¶ 14-15. In contrast, Dr. Shadigian agrees that telling women that excessive bleeding or hemorrhage is a risk of abortion, as specified in section 34-23A-10.1(1)(e)(iv), is true because it is true that

14

abortion causes hemorrhage and may cause an individual woman who has an abortion to hemorrhage. Pls.' Statement at ¶ 16.  In referring to this testimony, Defendants acknowledge, "If something has been proven to be a direct cause for a subsequent complication, <u>then that complication is certainly a risk of the underlying causal event</u>."  Defendants' Response to Plaintiffs' Motion for Summary Judgment ("Opp.") at 21 (emphasis added).  Thus, at a minimum, one "certain" message conveyed by the statement that a "risk" of abortion is suicide is that abortion causes or may cause suicide.  The State's real agenda is thus laid bare—to mislead women into believing that abortion causes suicide ideation and suicide.

Because they cannot dispute it is untruthful and misleading to tell a woman that abortion causes or may cause suicide, Defendants have argued that the suicide disclosure only says that abortion is "associated" with an increased risk of suicide and suicide ideation.[9]  Defendants' Opp. at 20.  However, the Act cannot be read to mandate communication of a supposed "association."  The disclosure does <u>not</u> say that abortion is "associated" with an increased risk of suicide, and the Court cannot read in this language.  *See, e.g.*, *Anderson v. City of Tea*, 725 N.W.2d 595, 597 (S.D. 2006) ("The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute.  The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used."); *see*

---

[9] Moreover, if the Act required physicians to disclose all risks "associated" with abortion, physicians would be required to state "abortion increases the risk that the pregnant woman will be murdered" and "abortion increases the risk that the pregnant woman will die from a car accident or other type of accident."  The main study relied on by Defendants demonstrates that the evidence supporting an association between these risks and abortion is similar to, and, in the case of murder, even stronger than, the evidence demonstrating an association between abortion and suicide.  Pls.' Statement at ¶ 18.  But, of course, the Act does not include murder or accidents in its list of "increased risk[s]" alongside suicide.  It is equally absurd to require physicians to tell patients that an increased risk of suicide is a "known medical risk" of abortion.

*also In re Estate of Olson*, 744 N.W.2d 555, 566 (S.D. 2008) (it is "fundamental that we must confine ourselves to the intention as expressed in the language used. To violate the rule against supplying omitted language would be to add voluntarily.") If this were the message the disclosure intended to convey, the State could easily have used inserted the word "associated." It did not do this.

To the contrary, the State <u>deleted the word "associated" when it amended the prior informed consent statute</u>. The prior statute required physicians to disclose "the particular medical risks <u>associated</u> with the particular abortion procedure to be employed." SDCL § 34-23A-10.1(1)(b) (1993) (emphasis added). The current statute, in sharp contrast, requires physicians to disclose "known medical risks of the procedure" "including" an "increased risk of suicide ideation and suicide." It is "an established principle of statutory construction that, where the wording of an act is changed by amendment, it is evidential of an intent that the words shall have a different construction." *Lewis & Clark Rural Water Sys., Inc. v. Seeba*, 709 N.W.2d 824, 831 (S.D. 2006); *see also Rosander v. Bd. of County Comm'rs*, 336 N.W.2d 160, 161 (S.D. 1983). Thus, it is beyond cavil that the State did not intend the suicide disclosure to say, much less only say, that abortion is "associated" with an increased risk of suicide and suicide ideation.

In addition, the discussion of "known risks" in connection with informed consent is about cause and effect relationships. Patients must be informed of the material risks of a procedure that can be avoided if they choose not to undergo the procedure, which they can only do if the risks are causally related to the procedure. Indeed, in an informed consent lawsuit, a patient must prove not only that he or she should has been advised of a purported risk, a patient must prove medical causation: that the non-disclosed risk proximately materialized as a direct result of the procedure, and not some pre-existing or other cause. *See Wheeldon v. Madison,* 374 N.W.2d

16

367, 376 (S.D. 1985); *Lohr v. Watson,* 2 N.W.2d 6, 8 (S.D. 1942) (seminal case discussing causation in medical malpractice cases); *Howard v. University of Medicine and Dentistry of New Jersey,* 800 A.2d 73, 80 (N.J. Sup. Ct. 2002) ("In an informed consent case, the plaintiff must additionally . . . prove that the undisclosed risk actually materialized and that it was medically caused by the treatment."); *Lasley v. Georgetown University,* 688 A.2d 1381, 1387-88 (D.C. 1997).

Finally, even if the disclosure merely refers to an association between abortion and suicide, the suicide disclosure is untruthful and misleading because there is no recognized or reasonable evidence of an association between abortion and suicide. This is confirmed by the FDA's actions under the "federal model" in 21 C.F.R. § 201.57(e), upon which the State heavily relied in opposing summary judgment. Defendants' Opp at 22.[10] The FDA approved mifepristone for medical abortions in 2000, and since then has mandated not only the specific warning label for that drug, but also a medication guide and agreement for patients. (August 8, 2006 Second Branson Decl. Exs. CC and DD [submitted with Plaintiffs' summary judgment Reply Brief)). Although these items (Ex. DD at 1, 5-8, 11, 16, and 18-19) mention risks such as bleeding and infection (also mentioned in SDCL § 34-23A-10.1(1)(e)(iv)), none of these items mention suicide or suicide ideation, as they would have to if they were known risks of abortion or if there were actually "reasonable evidence" (21 C.F.R. § 201.57(e)) of an association of suicide and suicide ideation with medical abortion. The fact that the FDA has mandated a suicide warning in connection with Paxil, which the State relied upon in opposing summary

---

[10] The State argued that "[t] he giving of a warning with regard to suicide and suicide ideation based on a showing of association but not a showing of causation simply follows the federal model. The Code of Federal Regulations requires warnings to be given in writing with regard to prescription drugs "as soon as there is reasonable evidence of an association of a serious hazard with a drug: a causal relationship need not have been proved." Ex. 63 (21 C.F.R. 201.57(e)) (emphasis added)." Defendants' Opp. at 22.

17

judgment, and failed to this day to do so in connection with mifepristone, is compelling scientific evidence in favor of Plaintiffs, which also refutes the anecdotal evidence upon which the State has relied.

In short, Plaintiffs have more than met any applicable standard or pre-requisite to a preliminary (and permanent) injunction of SDCL §§34-23A-10.1 (1)(e)(ii).[11]

### III. THE ACT MUST BE PRELIMINARILY ENJOINED IN ITS ENTIRETY

*Rounds III* declined to address the Court's prior reading of Section 10 of the Act that if any of the provisions of Section 7 were preliminarily enjoined, Section 7 must be preliminarily enjoined in its entirety, with the 2003 version of § 34-23A-10.1 to remain in effect in the interim. The Court's prior application of Section 10 is correct. Moreover, the application of Section 10 is wholly a question of state law. Federal case law addressing the scope of injunctions in circumstances where there is no state statutory provision like Section 10 is entirely irrelevant.

Section 10 is closely paired with Section 11, which provides a clear and undisputed directive to sever unconstitutional provisions, if possible, in the event that any of the provisions of Section 7 are permanently enjoined. In appealing the Court's order on the scope of the Section 10, Defendants and the State contend that Section 10 operates in exactly the same manner as Section 11, even though the language is not parallel and the word "sever" does not appear in Section 10. Following the Eighth Circuit's directive not to analyze statutory provisions "in isolation," *Rounds III*, 2008 WL 2550722, at *8, the Court was correct in originally

---

[11] *Washington State Grange v. Washington State Republican Party*, 128 S.Ct. 1184 (2008), does not change Plaintiffs' burden with respect to a facial challenge. See *Rounds III*, 2008 WL 255072, at *7 & n.8; see *also id.* at *18 n.17 (Murphy, J., dissenting) (rejecting argument that the rule articulated in *Washington State Grange* applies to facial challenges to abortion legislation). This conclusion is consistent with Eighth Circuit precedent. *See, e.g.*, *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456-58 (8th Cir. 1995) (holding that *Casey* applies to facial challenges to abortion statutes"); *Carhart v. Gonzales*, 413 F.3d 791, 795 (8th Cir. 2005), rev'd on other grounds, *Gonzales v. Carhart*, --- U.S. ---, 127 S. Ct. 1610 (2007).

concluding that the different phrasing of Sections 10 and 11 was intended to convey differences in application. Since the intent to sever is express in Section 11, the Court properly concluded that the absence of a reference to severability in Section 10 meant that the Court should not engage in preliminary severance, and should instead simply continue the prior disclosure protocol in effect while the litigation was pending.

The State has complained that the Court's approach effectively changes the phrase "implementation of the provisions of section 7" in Section 10 to "implementation of *any of* the provisions of section 7," but this interpretation is far more consistent with the text than the wholesale substitution of the phrasing of Section 11 for that of Section 10, and indeed, renders the distinction between Section 10 and Section 11 superfluous.

Finally, the Court's interpretation is also the only interpretation that makes practical sense. Under the Court's interpretation, a preliminary injunction results in a single disclosure regime remaining in place until the merits of the Complaint are finally determined. Under the State's approach, in contrast, women and physicians would be subject to a crazy-quilt hybrid set of disclosures during the pendency of the litigation, and then subject to a third regime, or a return to the 2005 protocol, upon conclusion of the litigation. This would impose chaos on abortion providers and confusion upon women, and would be inconsistent with the State's professed concern for a comprehensible informed consent process. There is no reason for the Court to change its interpretation of Section 10, which neither the en banc majority nor the original Eight Circuit panel rejected.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' application for a temporary restraining order and their motion for a preliminary injunction.

Dated: July 11, 2008	DORSEY & WHITNEY LLP


By: s/Stephen D. Bell	
	Stephen D. Bell (S.D. #3488)
	Republic Plaza Building, Suite 4700
	370 17th Street
	Denver, CO 80202-5647
	Telephone: (303) 629-3400
	Fax: (303) 629-3450

	DORSEY & WHITNEY LLP
	Timothy E. Branson (MN #174713)
	Michael Drysdale (MN #257606)
	Suite 1500, 50 South Sixth Street
	Minneapolis, MN 55402-1498
	Telephone: (612) 340-2600

	Roger Evans
	Planned Parenthood Federal of America
	434 West 33rd Street
	New York, NY 10001
	Telephone: (212) 541-7800

	Attorneys for Plaintiffs PLANNED
	PARENTHOOD OF
	MINNESOTA/NORTH DAKOTA,
	SOUTH DAKOTA, AND CAROL E.
	BALL, MD.