UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD MINNESOTA, NORTH DAKOTA, SOUTH DAKOTA, and CAROL E. BALL, M.D., | ) ) ) ) ) | Civ.  05-4077-KES |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' |
| MIKE ROUNDS, Governor, and LARRY LONG, Attorney General, in their official capacities, | ) ) ) ) | MOTION FOR SUMMARY JUDGMENT, INTERVENORS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFFS' |
| Defendants, | ) ) ) | MOTION FOR SUMMARY JUDGMENT |
| ALPHA CENTER, BLACK HILLS CRISIS PREGNANCY CENTER, d/b/a Care Net, DR. GLENN RIDDER, M.D., and ELEANOR D. LARSEN, M.A., L.S.W.A., | ) ) ) ) ) ) | |
| Intervenors. | ) | |

In 2005, the South Dakota Legislature passed House Bill 1166, which

revised South Dakota law on informed consent to abortion by expanding the

disclosure requirements.[1]  Plaintiffs, Planned Parenthood Minnesota, North

Dakota, South Dakota and Carol E. Ball, M.D., commenced an action, arguing

that the informed consent disclosures required by the statute were

---

[1] The disclosure requirements include a biological disclosure, relationship disclosures, and medical risk disclosures, which will be discussed in further detail herein.

unconstitutional, and moved for a preliminary injunction.  Docket 1 and Docket 10.  This court granted the motion for preliminary injunction, finding that the disclosures violated the First Amendment rights of the physicians by requiring them to espouse the state's ideology, and a panel of the Eighth Circuit Court of Appeals affirmed.  Docket 40 and Docket 232.  The Eighth Circuit Court of Appeals, on rehearing en banc, vacated the panel decision and reversed the district court's decision and remanded the case to the district court for consideration of the remaining issues.  See Planned Parenthood v. Rounds, 530 F.3d 724 (8th Cir. 2008) (en banc) (Rounds III).  Upon remand, the parties filed motions regarding the preliminary injunction originally sought by plaintiffs.  Docket 241, Docket 245, and Docket 246.  The court consolidated the preliminary and permanent injunction motions for trial.  The court allowed the parties to amend their then-pending motions for summary judgment and set new deadlines for the motions.  Docket 256.

Defendants, Governor Mike Rounds and Attorney General Larry Long, now move for summary judgment with respect to the biological disclosure, relationship disclosures, medical risk disclosures, and medical emergency exception.  Intervenors, Alpha Center, Black Hills Crisis Pregnancy Center, Dr. Glenn Ridder, and Eleanor Larsen, move for partial summary judgment with respect to the biological disclosure and relationship disclosures.

Plaintiffs move for summary judgment with respect to the relationship disclosures, medical risk disclosures, and medical emergency exception.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not,

however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

## DISCUSSION

### I.     Biological Disclosure

Defendants and intervenors contend that the biological disclosure is constitutional as a matter of law in light of Rounds III.  Plaintiffs agree that the court can render final declaratory relief that the biological disclosure is constitutional as long as the court determines that the statute only requires that specific biological information be provided and that this information may be provided in words chosen by the physician.

The statute requires the physician to inform the pregnant woman "[t]hat the abortion will terminate the life of a whole, separate, unique, living human being" (biological disclosure).  SDCL 34-23A-10.1(1)(b).  "Human being" is defined by the statute as "an individual living member of the species of Homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation."  SDCL 34-23A-1(4).

In Rounds III, 530 F.3d at 735, the Eighth Circuit determined that "Planned Parenthood cannot succeed on the merits of its claim that [the biological disclosure] violates a physician's right not to speak unless it can show that the disclosure is either untruthful, misleading or not relevant to the

4

patient's decision to have an abortion."  The court noted that "it would be incumbent upon one preparing the disclosure form required by [the statute], and upon a physician answering a patient's questions about it, to account for any applicable statutory definitions."  Id.  Consequently, the court found that

> [o]nce one accepts that the required disclosure must take into account the limiting definition [of human being], the evidence submitted by the parties regarding the truthfulness and relevance of the [biological disclosure] generates little dispute.  The disclosure actually **mandated** by [the biological disclosure], in concert with the definition [of human being], is that the abortion will terminate the life of a whole, separate, unique, living human being, [biological disclosure], and that human being in this case means an individual living member of the species of Homo sapiens . . . during [its] embryonic [or] fetal age."

Id. at 735-36 (emphasis added).  The Eighth Circuit explained that "[t]he State's evidence suggests that the biological sense in which the embryo or fetus is whole, separate, unique and living should be clear in context to a physician, and Planned Parenthood submitted no evidence to oppose that conclusion."  Id. at 736.

It is evident from the Eighth Circuit's discussion that it found that the statute mandated that the physician inform the pregnant woman about the biological disclosure using the words set forth in the statute, especially in light of the fact that the Eighth Circuit found that the definition of "human being" should be disclosed in connection with the biological disclosure.  Although defendants' oral argument and Judge Gruender's dissent in the initial Eighth Circuit opinion suggest that the statute does not mandate a

script but rather merely directs the physician to categories of information that must be disclosed to patients, this court is bound to follow the en banc opinion of the Eighth Circuit, which has determined that the disclosure be made with the words set out in the statute and any applicable statutory definitions.

Accordingly, the court finds that before performing abortions, the physician must inform the patient "[t]hat the abortion will terminate the life of a whole, separate, unique, living human being." SDCL 34-23A-10.1(1)(b). But, as the State concedes in its reply brief, nothing prohibits the physician from providing the patient with additional information, including that the term "human being," as used in the statute, is used in a biological sense and not an ideological sense. Docket 289, at 6. Thus, defendants' and intervenors' motions for summary judgment are granted with respect to the biological disclosure.

## II.    Relationship Disclosures

In order to obtain informed consent to an abortion, the statute requires a physician to inform the pregnant woman "[t]hat the pregnant woman has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota." SDCL 34-23A-10.1(1)(c). Further, in accordance with the statute, the physician must tell the pregnant woman "[t]hat by having an

abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated." SDCL 34-23A-10.1(1)(d) (relationship disclosures).

Defendants and intervenors argue that the relationship disclosures require the same awareness as in the context of waiving parental rights. They assert that the relationship is protected under the United States Constitution pursuant to case law and is protected under the laws of South Dakota based upon South Dakota statutes addressing unborn children in the context of wrongful death and homicide causes of action as well as other similar statutes. They further argue that a relationship exists between a pregnant woman and a fetus because they are physically and psychologically connected.

Plaintiffs respond that the relationship disclosures are unconstitutional because they are untruthful and misleading. Plaintiffs assert that the United States Constitution does not protect any alleged relationship between the pregnant woman and the embryo or fetus but instead it protects the woman's right to choose to have an abortion. Plaintiffs further assert that the laws of South Dakota do not protect any alleged relationship between the pregnant woman and the embryo or fetus because the laws concerning wrongful death actions, criminal homicide, support obligations, and life-sustaining treatment for a pregnant woman were adopted to address other concerns.

The Eighth Circuit has determined that "Casey and Gonzales establish that, while the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion." Rounds III, 530 F.3d at 734-35. The burden is on plaintiffs to show that "the disclosure is either untruthful, misleading, or not relevant to the patient's decision to have an abortion." Id. at 735.

Here, the statute requires the physician to inform the pregnant woman that she has an existing "relationship" with an unborn human being and that an abortion will terminate that existing "relationship." SDCL 34-23A-10.1(b)-(c). Significantly, the statute does not define the term "relationship." See SDCL 34-23A-1. But at the July 17, 2009, renewed preliminary injunction hearing, the State conceded that the term "relationship" is used in a legal context, not a biological context.

In the legal context, "relationship" is defined as "the nature and association between **two or more people**; esp. a legally recognized association that makes a difference in the participants' legal rights and duties of care." Black's Law Dictionary, 8th ed. (2004) (emphasis added). Accordingly, in order for a relationship to exist in the legal context, there must be two

persons. Under Roe v. Wade, 410 U.S. 113, 158, 162, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), which is still controlling precedent, the United States Supreme Court held that "the word 'person,' as used in the Fourteenth Amendment, does not include the unborn" and further acknowledged that "the unborn have never been recognized in the law as persons in the whole sense." The fact that the legislature has included an unborn embryo and fetus within the meaning of the term "human being" does not elevate the status of that unborn embryo or fetus to a "person" within the meaning of the established laws. Consequently, in the legal context, a pregnant mother cannot have a "relationship" with a "human being," as that word is defined in the statute. As a result, the relationship disclosures are untruthful and misleading and, as such, are unconstitutional.

Moreover, the court is unaware and the parties have failed to cite any controlling authority finding that a legal relationship exists between a pregnant woman and an unborn embryo or fetus and that such a legal relationship is protected by the United States Constitution. In fact, all of the United States Supreme Court cases cited by defendants and intervenors in support of the relationship disclosures involve the relationship between a parent and a born child. See Meyer v. Nebraska, 262 U.S. 390, 399, 43 S. Ct. 625, 626, 67 L. Ed. 1042 (1923) (noting that liberty includes the right of an individual to establish a home and raise children); Pierce v. Society of the

Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 534-35, 45 S. Ct. 571, 573, 69 L. Ed. 1070 (1925) (recognizing that parents have a liberty interest in directing the upbringing and education of children); Moore v. City of E. Cleveland, Ohio, 431 U.S. 494, 503, 97 S. Ct. 1932, 1938, 52 L. Ed. 2d 531 (1977) (stating that the Constitution protects the sanctity of the family); Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95, 71 L. Ed. 2d 599 (1982) (determining that natural parents have a fundamental liberty interest in the care, custody, and management of their children); Lehr v. Robertson, 463 U.S. 248, 256, 259-260 n.16, 103 S. Ct. 2985, 2990, 2992, 77 L. Ed. 2d 614 (1983) (stating that the parent-child relationship is "sufficiently vital to merit constitutional protection in appropriate cases" and that a mother's parental relationship with a child is clear because she carries and bears the child); and Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000) (acknowledging that the liberty of parents and guardians includes the right to direct the upbringing and education of children under their control). Accordingly, the United States Supreme Court has not recognized that the relationship between a parent and an unborn embryo or fetus is a legal relationship protected by the United States Constitution. As such, this particular portion of the relationship disclosure is untruthful and misleading.

Similarly, none of the South Dakota statutes and cases cited by defendants and intervenors establish that a pregnant woman has a legal relationship with an unborn embryo or fetus or that such a relationship is protected by the laws of South Dakota. <u>See</u> SDCL 21-5-1 (stating that any person, including an unborn child, can bring a wrongful death cause of action but making no mention of a protected legal relationship between a pregnant mother and an unborn embryo or fetus); SDCL 22-16-4 (stating that first-degree murder is the premeditated killing of any other human being, including an unborn child but not addressing whether there is a protected legal relationship between a pregnant mother and an unborn embryo or fetus); SDCL 59-7-2.8 (stating that artificial nutrition and hydration for pregnant women to allow the continuing development and live birth of the unborn child in certain circumstances is required but making no mention of a protected legal relationship between a pregnant woman and an unborn embryo or fetus); SDCL 25-7-19 (stating that the child neglect statutes apply to an unborn child that has been conceived but making no reference to a protected legal relationship between a pregnant woman and an unborn embryo or fetus); and SDCL 22-16-7 (stating that second-degree murder is a killing perpetuated by an act imminently dangerous to others and without regard for human life of another person, including an unborn child but not discussing whether there is a protected legal relationship between a pregnant mother and

11

an unborn embryo or fetus).  See also Farley v. Mount Marty Hosp. Ass'n, 387

N.W.2d 42 (S.D. 1986) (finding that a cause of action exists in South Dakota

for the wrongful death of a viable unborn child because the purpose of the

wrongful death statute is to provide a cause of action against those whose

tortious conduct causes the death of another) and Wiersma v. Maple Leaf

Farms, 543 N.W.2d 787 (S.D. 1996) (finding that a cause of action exists in

South Dakota for the wrongful death of a nonviable unborn child because the

statute specifically included "unborn child" within the term "person").

Therefore, South Dakota has not recognized that the relationship between a

parent and an unborn embryo or fetus is a legal relationship protected by

state laws.  Thus, this particular portion of the relationship disclosure is also

untruthful and misleading.

In sum, the relationship disclosures are untruthful and misleading.  A

legal relationship requires two people.  The United States Constitution does

not recognize an unborn embryo or fetus as a "person," in the legal sense.

Further, South Dakota has not recognized an unborn embryo or fetus as a

"person" in the context of a relationship with a pregnant woman.  As such,

neither the United States Constitution nor South Dakota law recognizes that a

pregnant woman and an unborn embryo or fetus have a legal relationship.  It

follows that neither protects such a relationship.  Accordingly, summary

judgment is granted to plaintiffs on the relationship disclosures.

### III.    Medical Risk Disclosures

The informed consent abortion statute requires a physician to provide the pregnant woman with "[a] description of all known medical risks of the procedure and statistically significant risk factors to which the pregnant woman would be subjected, including . . . (ii) Increased risk of suicide ideation and suicide." SDCL 34-23A-10.1(1)(e) (medical risk disclosures). Defendants argue that this disclosure is not vague and is truthful and non-misleading and, therefore, constitutional. Plaintiffs assert that the disclosure is vague and untruthful and misleading and, therefore, unconstitutional.[2]

The standard for determining whether a statute is unconstitutionally vague is whether it gives people of ordinary intelligence fair notice that certain conduct is prohibited. A statute is unconstitutionally vague where people of ordinary intelligence may apply the statute differently. Further, a statute will be held unconstitutional for vagueness where the forbidden conduct is so poorly defined that a person of common intelligence must necessarily guess at its meaning and differ as to its application. Additionally, a statute must not be so vague as to permit selective or discriminatory enforcement. See United States v. Smith, 171 F.3d 617, 622-23 (8th Cir. 1999).

---

[2] Intervenors did not move for summary judgment on this disclosure and, thus, only responded to plaintiffs' motion for summary judgment.

## A.    All Known Medical Risks

Defendants argue that the phrase "all known medical risks" is not unconstitutionally vague because doctors have an obligation to keep up to date on current medical literature.  Defendants assert that the statute only requires the physician to inform the patient about risks of a procedure that he reasonably knows about.[3]  Plaintiffs argue that this phrase is vague because it is not limited in the statute in any way.  Plaintiffs maintain that the statute is unclear as to whom the risk must be known and/or what research or findings, if any, are required to demonstrate that the risk is known.  Plaintiffs also emphasize that prior to the statute, South Dakota's informed consent abortion statute limited the risks that must be disclosed to "medically accurate risks."

The South Dakota Supreme Court has adopted a patient-oriented standard to be used in traditional medical malpractice informed consent cases, determining that "the standard measuring the performance of the physician's duty to disclose is conduct which is reasonable under the circumstances." Wheeldon v. Madison, 374 N.W.2d 367, 374 (S.D. 1985). Further, "a reasonable disclosure [is] one which apprises the patient of all known material or significant risks inherent in a prescribed medical

---

[3] In response to plaintiffs' motion for summary judgment, intervenors argue that the term "known risks" is well known to the medical profession.

procedure, as well as the availability of any reasonable alternative treatment or procedures." Id. at 375. The court explained that a risk is material "when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or risks in deciding whether to submit to the proposed medical treatment or procedure." Id. Moreover, the court characterized "materiality" as the "cornerstone upon which the physician's duty to disclose based." Id.

Here, the statute requires the physician to disclose to the patient "all known medical risks of the [abortion] procedure." SDCL 34-23A-10.1(e). The only difference between informed consent in abortion cases and informed consent in traditional medical malpractice cases is the requirement of materiality. While informed consent in traditional medical malpractice cases requires physicians to disclose "all known material or significant risks inherent in a prescribed medical procedure," Wheeldon, 374 N.W.2d at 375, informed consent in abortion cases requires physicians to disclose "all known medical risks of the [abortion] procedure." SDCL 34-23A-10.1(e). Because physicians have been able to determine what is meant by "all known material or significant risks in a medical procedure" in order to comply with the informed consent requirement in traditional medical malpractice cases for at

least twenty years,[4] plaintiffs' argument that the phrase "all known medical risks" is unconstitutionally vague is unpersuasive. Although the number of known risks disclosed in abortion cases may be more than in traditional cases because traditional cases only require material risks to be disclosed, the court finds that the phrase "all known medical risks" as used in the statute is not too uncertain that an individual could not ascertain the meaning of it in order to comply with it. Accordingly, defendants' motion for summary judgment is granted in relation to the constitutionality of the phrase "all known medical risks" on its face.

### B. Statistically Significant Risk Factors

Likewise, defendants argue that the phrase "statistically significant risk factors" is not unconstitutionally vague. Defendants emphasize that while the legislature could have drafted the statute more artfully, it is clear that the legislature intended that physicians advise patients of both the risks of the procedure as well as the statistically significant risk factors which, if present with a particular patient, would increase the likelihood that she may suffer these risks. Defendants also assert that the phrase "statistically significant" as used in the statute is not vague because the .05 level is the most common

---

[4] The South Dakota Supreme Court decided Wheeldon, 374 N.W.2d at 375, which set forth the requirement that the physician must inform the patient of "all known material or significant risks inherent in a prescribed medical procedure," in 1985.

in social science and an analyst who speaks of significant results without specifying the threshold probably is using this figure. Plaintiffs argue that this phrase is vague because "risk factor" refers to a predisposing condition that a patient has before a procedure and that, therefore, it is illogical to require physicians to disclose "risk factors to which the pregnant woman would be subjected to." Further, plaintiffs assert that it is similarly illogical to require physicians to disclose that "risk factors . . . includ[e] depression and related psychological distress [and] increased risk of suicide ideation and suicide." Plaintiffs also argue that the phrase "statistically significant" is meaningful only with further explanation of what level of probabilistic confidence there is in a conclusion of non-random correlation.

The statute as drafted is unconstitutionally vague. Because a "risk factor" refers to a predisposing condition that a patient has before a procedure, it is improperly used in the same clause as "medical risk," which is something that a patient is subject to during or after a procedure.[5] As the statute reads, physicians are required to disclose "risk factors to which the pregnant woman would be subjected to," which is confusing and actually impossible. Even if the court were to read the statute with commas placed

_____

[5] While the State's expert testified risks and risk factors are usually used interchangeably, she also testified that "a risk of something is usually after a procedure or during a procedure and a risk factor is something that's predisposing." Docket 147-15 at 23.

after the words "procedure," and "risk factor," as suggested by the State, the court finds the statute would still be confusingly vague. While the commas would isolate the clause "statistically significant risk factors," this would not eliminate the reference to depression, related psychological distress, and increased risk of suicide ideation and suicide. The legislature's placement of "risk factors" indicates the legislature may not have fully understood the meaning of this phrase as used in the medical profession and may have intended for it to mean something different than what is meant in the medical profession. See Schmitt v. Nord, 27 N.W.2d 910, 913 (S.D. 1947) (stating that a statute "must be construed, and the intent and meaning of the Legislature ascertained, from the language of the act, and words used therein are to be given their ordinary meaning unless the context shows that they are differently used").

Because the phrase "risk factors" is not defined in the statute, a physician would be left to guess as to the meaning the legislature intended to give to the phrase. The statute, as written, does not provide a physician with adequate notice about what he must disclose to patients in terms of "risk factors" and lends itself to arbitrary enforcement regarding the meaning of that phrase.

Moreover, the scienter requirement does not save the statute from being unconstitutionally vague. Although the physician must knowingly or in

18

reckless disregard fail to disclose the information required under the statute to the patient, if the physician is unable to ascertain what the legislature meant by "risk factor," such a scienter requirement does not aid the physician in this determination. In other words, the scienter requirement modifies a vague phrase and does not make the statute's vague language any more certain. Accordingly, the court finds that the placement of the phrase "statistically significant risk factors" makes the statute unconstitutionally vague and summary judgment is granted to plaintiffs with regards to this phrase.

### C. Increased Risk of Suicide Ideation and Suicide

Defendants argue that the suicide ideation and suicide disclosure warning cannot be shown to be untruthful or misleading because abortion is "associated" with suicide according to medical studies and statistical studies. Defendants further assert that it constitutes good medical practice to advise patients of risks even if it cannot be proven definitely that an abortion, rather than the common risk factors, is the cause of suicide ideation or suicide. Defendants point out that the statute does not prohibit full disclosure and explanation of the data with regard to the difference between an association and cause.[6]

---

[6] In response to plaintiffs' motion for summary judgment, intervenors argue that literature supports the finding that abortion places a woman at increased risk of suicide ideation and suicide.

Plaintiffs respond that telling a woman that increased risk of suicide is a known medical risk of abortion could suggest to her that an abortion may lead to suicide, which is untruthful and misleading because it is undisputed that abortion does not cause suicide. Plaintiffs contend that the statute requires disclosure only of known medical risks caused by an abortion procedure and not medical risks associated with an abortion procedure. Plaintiffs also argue that suicide ideation and suicide are not "known" risks of abortion.

The prior informed consent statute required physicians to disclose "the particular medical risks **associated** with the particular abortion procedure to be employed." SDCL 34-23A-10.1(1)(b) (2004) (emphasis added). The 2005 amendments deleted the word "associated" from the statutory language and now require physicians to disclose "all known medical risks of the procedure" "including" an "[i]ncreased risk of suicide ideation and suicide." SDCL 34-23A-10.1(1)(e)(ii).

The South Dakota Supreme Court has recognized that it is "an established principle of statutory construction that, where the wording of an act is changed by amendment, it is evidential of an intent that the words shall have a different construction." Lewis & Clark Rural Water Sys., Inc. v. Seeba, 709 N.W.2d 824, 831 (S.D. 2006) (citation and quotation omitted). "When a prior statute is amended by alteration of the terms, it must be presumed that

it was the [Legislature's] intent to alter the meaning of the previous act in that particular." State v. Heisinger, 252 N.W.2d 899, 902 (S.D. 1977) (citation and quotation omitted). Applying the rules of statutory construction as set forth by the South Dakota Supreme Court, this court finds that because the legislature altered the language of the informed consent provision by deleting the term "associated," the legislature intended to alter the meaning of the previous act and require that the patient be informed of medical risks that are caused by the abortion procedure, not just associated with the abortion procedure.

In the event the court finds that the statute requires a finding of causation rather than association, then defendants contend that there is a rational basis to conclude that abortion may cause suicide. But the language of the statute requires disclosure of "known" medical risks of the procedure, and a "known" risk is one that is generally recognized. See Merriam-Webster Dictionary available at http://www.merriam-webster.com/dictionary/known.

In determining whether the increased risk of suicide ideation and suicide are "known" risks, the court will examine the evidence in the record. The American College of Obstetricians and Gynecologists, which is the leading professional association of physicians who specialize in the health care of women, rejects any suggestion that increased risk of suicide and suicide ideation are known risks of abortion. The American Psychological

21

Association's Task Force on Mental Health and Abortion has reviewed the most current research in this area and concluded that there is "no evidence sufficient to support the claim that an observed association between abortion history and a mental health problem was caused by the abortion per se, as opposed to other factors." Docket 283-4, at 24. Additionally, the United States Food & Drug Administration approved mifepristone to be used to induce an abortion without surgical procedure and did not mention suicide ideation or suicide as a risk on its labeling. Furthermore, Dr. Elizabeth Shadigian, one of defendants' designated experts, stated under oath that, "it would not be accurate to advise an elective abortion patient that abortion causes suicide." Docket 172-5, at 3. She also testified that she does not know of an elective abortion provider in the United States that warns women that suicide is one of the risks of abortion. Docket 147-15, at 14-15.

Defendants rely on their experts' opinions and five limited studies to show an association between suicide ideation and abortions. Defendants have produced no evidence, however, to show that it is generally recognized that having an abortion causes an increased risk of suicide ideation and suicide. Because such a risk is not "known," the suicide disclosure language of the statute is untruthful and misleading. Thus, plaintiffs are entitled to summary judgment in their favor on this issue.

## IV.     Medical Emergency Exception

The statute also mandates the physician to obtain the informed consent of the pregnant woman before performing an abortion "unless the physician determines that obtaining an informed consent is impossible due to a medical emergency and further determines that delaying in performing the procedure until an informed consent can be obtained from the pregnant woman or her next of kin . . . is impossible due to the medical emergency, which determinations shall then be documented in the medical records of the patient." SDCL 34-23A-10.1 (medical emergency exception).

Defendants argue that plaintiffs have no standing to challenge the medical emergency exception provision to the statute because the Sioux Falls Planned Parenthood facility does not offer emergency services and high risk patients are referred elsewhere. Even if plaintiffs do have standing to challenge this provision, defendants assert that this provision is constitutional because the meaning of the term "impossible" is ascertainable and the statute contains a scienter requirement.[7]

Plaintiffs argue that they have standing to challenge this provision because the physicians are the ones against whom the criminal statutes

_____

[7] Intervenors also did not move for summary judgment on this provision and, thus, only responded to plaintiffs' motion for summary judgment. In response to plaintiffs' motion for summary judgment, intervenors argue that plaintiffs do not have standing to challenge this provision.

directly operate. Plaintiffs further assert that the statute is unconstitutional because it requires a physician to determine if obtaining the consent required by the act is "impossible." Plaintiffs emphasize that there is no way for a physician to know in advance, when facing a medical emergency, whether there is adequate time to obtain the informed consent required by the statute from the patient or her next of kin.

### A. Standing in Relation to the Medical Emergency Exception

### 1. Physician's Standing

"To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury will likely be redressed by a favorable decision." Pucket v. Hot Springs Sch. Dist. No. 23-2, 526 F.3d 1151, 1157 (8th Cir. 2008) (quoting Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000)). "The injury must be 'concrete,' not 'conjectural' or 'hypothetical.'" Id. (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)). "Typically . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." Id. (quoting Allen v. Wright, 468 U.S. 737, 752, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)).

The United States Supreme Court has determined that physicians who perform abortions have standing to challenge a statute that may subject them to criminal prosecution.  Doe v. Bolton, 410 U.S. 179, 188, 93 S. Ct. 739, 745, 35 L. Ed. 2d 201 (1973).  In Bolton, physicians challenged a Georgia statute that, among other things, made abortion unlawful unless it was performed by a licensed physician who, based on his best clinical judgment, believed an abortion was necessary due to danger of the woman's life, the defects of the fetus, or the result of rape.  410 U.S. at 183; 93 S. Ct. at 743.  The court concluded that the physicians "who [were] Georgia-licensed doctors consulted by pregnant women, . . . present[ed] a justiciable controversy and [did] have standing despite the fact that the record [did] not disclose that any one of them [had] been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes."  Bolton, 410 U.S. at 188; 93 S. Ct. at 745.  The court explained that "[t]he physician [was] the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions."  Id.  Accordingly, the court determined that the physicians "assert[ed] a sufficiently direct threat of personal detriment [and that] [t]hey should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."  Id.  As a result, the court held that the physicians had standing to challenge the constitutionality of the abortion statute.  Id.

Relying on the <u>Bolton</u> precedent, the court finds that plaintiffs have standing in the instant case because they are challenging a statute that may subject them to criminal prosecution.  Like <u>Bolton</u>, here, plaintiffs are challenging a state statute that makes performing an abortion illegal under certain circumstances.  Also, like <u>Bolton</u>, plaintiffs are the ones against whom the criminal statute directly operates in the event they perform an abortion without disclosing the statutory requisites.  The physicians at Planned Parenthood have stated their intention to continue to perform abortions for patients, some of whom may require an emergency abortion.  Further, as in <u>Bolton</u>, plaintiffs should not be required to await and undergo criminal prosecution as the only means of seeking relief.  Accordingly, the court finds that like the physicians in <u>Bolton</u>, plaintiffs in the instant case have presented a justiciable controversy and have standing.

## 2. Physicians' Standing to Assert Rights of Their Patients

Generally, even when a plaintiff has Article III standing, the plaintiff cannot litigate on the basis of the rights of others.  But under the doctrine of third-party standing, a plaintiff may assert the rights of others not before the court if the court finds that two factual elements are present and that those elements justify third-party standing.  <u>Kowalski v. Tesmer</u>, 543 U.S. 125, 130, 125 S. Ct. 564, 160 L. Ed. 2d 519 (2004).  "The first is the relationship of the litigant to the person whose right he seeks to assert."  <u>Singleton v. Wulff</u>, 428

U.S. 106, 114, 96 S. Ct. 2868, 2874, 49 L. Ed. 2d 826 (1976).  "The other

factual element to which the Court has looked is the ability of the third-party

to assert his own right."  Singleton, 428 U.S. at 115-16, 96 S. Ct. at 2875.

### a.      Relationship

In the context of abortion, a plurality of the United States Supreme

Court determined that the closeness of the relationship between a doctor and

a patient is patent because "[a] woman cannot safely secure an abortion

without the aid of a physician."  Singleton, 428 U.S. at 117, 96 S. Ct. at

2875.[8]  Additionally, "[t]he woman's exercise of her right to an abortion,

whatever its dimension, is therefore necessarily at stake" when a state passes

a statute that regulates abortion.  Id.  Further, "the constitutionally protected

abortion decision is one in which the physician is intimately involved."  Id.  It

follows that "[a]side from the woman herself, therefore, the physician is

uniquely qualified to litigate the constitutionality of the State's interference

with, or discrimination against, that decision."  Id.  See also Planned

Parenthood of S.E. Pa. v. Casey, 505 U.S. 833, 845, 112 S. Ct. 2791. 120 L.

---

[8] The court is aware that in Kolwaski v. Tesmer, 543 U.S. 125, 125 S. Ct.
564, 160 L. Ed. 2d 519 (2004), the United States Supreme Court determined
that attorneys do not have third-party standing to assert the rights of
defendants denied appellate counsel.  But that case did not directly deal with a
physician-patient relationship in the context of abortion.  Furthermore,
Kolwaski did not overrule Singleton and the court is bound to apply the
precedent of Singleton.

Ed. 2d 674 (1992) (allowing abortion providers to challenge a state statute on behalf of third-party women who seek abortion services).

Based on the Supreme Court ruling in Singleton, the court finds that plaintiffs have a close relationship with women seeking to obtain abortions. Here, as in Singleton, a woman needs the aid of a physician to undergo a safe abortion procedure, the statute in question puts a woman's right to an abortion into jeopardy, and the physician is significantly involved in a woman's abortion decision. Accordingly, as in Singleton, in the instant case, physicians are qualified to litigate the constitutionality of the state statute which regulates abortions because of their intimate relationship with their patients.

Moreover, many courts have found the physician-patient relationship to be sufficiently close for the physician to assert third-party standing in abortion cases. See Planned Parenthood of N. New Eng. v. Heed, 390 F.3d 53, 56 n.2 (1st Cir. 2004) (stating that "[b]ecause of their close relationship to the abortion decision, and the rights involved, [abortion] providers routinely have *jus tertii* standing to assert the rights of women whose access to abortion is restricted"), vacated on other grounds sub nom. Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 126 S. Ct. 961, 163 L. Ed. 2d 812 (2006); Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 917 (9th Cir. 2004) (stating that "[p]hysicians and clinics performing abortions are routinely

found to have standing to bring broad facial challenges to abortion statutes"),

cert. denied, 544 U.S. 948, 125 S. Ct. 1694, 161 L. Ed. 2d 524 (2005); and

Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127, 146 (3d Cir. 2000)

(stating that there is a "well-established precedent for the proposition that

abortion providers have third party standing to assert the rights of their

patients in the face of government intrusion into the abortion decision in

order to determine whether such interference would constitute an undue

burden").

     In addition to the cited authority, the court concludes that the policy

behind third-party standing is served by finding that plaintiffs in this case

have a sufficiently close relationship to assert their patients' rights. The

concern behind the "close relationship" determination is whether "the third

party can reasonably be expected properly to frame the issues and present

them with the necessary adversarial zeal." Sec'y of State of MD. v. Joseph H.

Munson Co., 467 U.S. 947, 956, 104 S. Ct. 2839, 81 L. Ed. 2d 786 (1984).

Here, the court finds that plaintiffs' interests align with those of their patients

in the event a medical emergency arises, such that they can provide proper

representation of those rights. Plaintiffs, therefore, satisfy the first

consideration regarding third-party standing.

**b.      Ability of Third Party to Assert Own Right**

Further, a plurality of the United States Supreme Court concluded that there are several obstacles to a woman's assertion of her right to an abortion. Singleton, 428 U.S. at 117; 96 S. Ct. at 2875.

> For one thing, she may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit. A second obstacle is the imminent mootness, at least in the technical sense, of any individual woman's claim. Only a few months, at the most, after the maturing of the decision to undergo an abortion, her right thereto will have been irrevocably lost.

Id. Using this case as guidance, the court finds that plaintiffs' patients do indeed face genuine obstacles to asserting their claims. A woman needing an abortion in an emergency situation would face the obstacle of imminent mootness. Her rights would be lost in a very short, limited period of time. Further, women may be hindered from asserting their rights because they do not want their health care decisions to be public information. Accordingly, the court finds that plaintiffs also meet the second consideration for third-party standing because of the difficulty a woman faces in pursuing her own claim.

In sum, plaintiffs have standing to challenge the medical emergency exception of the statute. First, the physicians themselves have standing because they are the ones that are subject to criminal prosecution for performing an abortion without following the statutory requisites. And

second, the physicians have standing to assert their patients' rights because a physician is intimately involved in a woman's decision to get an abortion and a woman faces several obstacles to asserting her right to an abortion.

## B.    Constitutionality of Emergency Medical Exception

Although the court finds that plaintiffs have standing, the court finds that the emergency medical exception is constitutional on its face. Importantly, "medical emergency" is defined in the statute as "any condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of irreversible impairment of a major bodily function." SDCL 34-23A-1(5). Under South Dakota common law relating to informed consent, a physician is not required to obtain the patient's consent in an emergency situation where the patient is in immediate danger. Wheeldon v. Madison, 374 N.W.2d 367, 375 (S.D. 1985). Thus, the statutory medical emergency exception for informed consent to abortion does not significantly differ from the common law medical emergency exception for informed consent to other medical procedures. Both require the physician to obtain informed consent unless a medical emergency threatens to immediately harm the patient.

In defining the common law medical emergency exception to informed consent, many state courts have stated that it must be "impossible" or "impracticable" to obtain informed consent to the medical procedure.  See In re Estate of Allen, 848 N.E.2d 202, 211-12 (Ill. App. 2006) (stating that "there are four essential elements required to establish that the common-law emergency exception [to the informed consent rule] applies: (1) there was a medical emergency; (2) treatment was required in order to protect the patient's health; (3) it was impossible or impractical to obtain consent from either the patient or someone authorized to consent for the patient; and (4) there was no reason to believe that the patient would decline the treatment, given the opportunity to consent"); Rogers v. Brown, 416 So. 2d 624, 630 (La. App. 1982) (determining that "consent of a patient . . . is required prior to a surgical procedure, and a surgeon who operates without such consent is liable in damages . . . , except in case of an emergency requiring immediate surgery for preservation of life or health under circumstances in which it is impractical to obtain the consent of the patient or someone authorized to assume that responsibility"); and Sard v. Hardy, 379 A.2d 1014, 1022 (Md. Ct. App. 1977) (finding that a "physician's duty to disclose is suspended where an emergency of such gravity and urgency exists that it is impractical to obtain the patient's consent").  It does not appear that those courts have had difficulty determining whether it was impossible or impractical to obtain

consent.  Further, as defendants point out, the American College of

Obstetricians and Gynecologists have used the word "impossible" and, thus,

medical professionals have been able to ascertain its meaning.  Thus, the

medical emergency exception is not unconstitutionally vague on its face.  As a

result, defendants' motion for summary judgment as to the medical

emergency exception is granted.

Accordingly, based on the foregoing, it is hereby

ORDERED that defendants' motion for summary judgment (Docket 261)

is granted in part with respect to the biological disclosure, part of the medical

risk disclosures, and the medical emergency exception and denied in part with

respect to the relationship disclosures and part of the medical risk

disclosures.

IT IS FURTHER ORDERED that intervenors' motion for partial summary

judgment (Docket 266) is granted in part with respect to the biological

disclosure and denied in part with respect to the relationship disclosures.

IT IS FURTHER ORDERED that plaintiffs' motion for summary

judgment (Docket 270) is granted in part with respect to the relationship

disclosures and part of the medical disclosures and denied in part with

respect to part of the medical risk disclosures and the medical emergency

exception.

IT IS FURTHER ORDERED that plaintiffs' renewed motion for preliminary injunction (Docket 315) and motion for temporary restraining order (Docket 335) are denied as moot.

Dated August 20, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE